Slip Op. 26-1

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **RISEN ENERGY CO., LTD.,** | |
| **Plaintiff,** | |
| **and** | |
| **TRINA SOLAR CO., LTD. ET AL.,** | |
| **Consolidated Plaintiffs,** | |
| **and** | |
| **SHANGHAI BYD CO., LTD. ET AL.,** | **Before: Claire R. Kelly, Judge** |
| **Plaintiff-Intervenors,** | **Consol. Court No. 20-03743** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **SUNPOWER MANUFACTURING OREGON, LLC,** | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand determination in the 2017–2018 administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Consol. Court No. 20-03743                                              Page 2

Dated: January 8, 2026

Gregory Stephen Menegaz and Alexandra H. Salzman, The Inter-Global Trade Law Group PLLC, of Washington, D.C., for plaintiff Risen Energy Co., Ltd.

Jonathan M. Freed, Jarrod Mark Goldfeder, and Robert George Gosselink, Trade Pacific PLLC, of Washington, D.C., for consolidated plaintiffs Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science & Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd.

Jeffrey Sheldon Grimson, Bryan Patrick Cenko, Jill A. Cramer, Kristin Heim Mowry, Sarah Marie Wyss, and Savannah Rose Maxwell, Mowry & Grimson, PLLC, of Washington, D.C., for consolidated plaintiffs and plaintiff-intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., and JingAo Solar Co., Ltd.

William Ellis Perry and Adams Chi-Peng Lee, Harris Bricken McVay Sliwoski, LLP, of Seattle, Washington, for consolidated plaintiffs Wuxi Tianran Photovoltaic Co., Ltd. and Shenzhen Sungold Solar Co., Ltd.

Jonathan Thomas Stoel, Craig Anderson Lewis, and Lindsay K. Brown, Hogan Lovells US LLP, of Washington, D.C., for consolidated plaintiff and plaintiff-intervenor Shanghai BYD Co., Ltd., and for plaintiff-intervenors Canadian Solar Inc., Canadian Solar International Limited, Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., and Canadian Solar (USA) Inc.

Richard L.A. Weiner, Rajib Pal, and Shawn Michael Higgins, Sidley Austin LLP, of Washington, D.C., for plaintiff-intervenors Yingli Energy (China) Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Lixian Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd., Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy Resources Co., Ltd., and Shenzhen Yingli New Energy Resources Co., Ltd. Lizbeth R. Levinson, Brittney Renee Powell, and Ronald M. Wisla, Fox Rothschild LLP, of Washington, D.C., for plaintiff-intervenor Anji DaSol Solar Energy Science & Technology Co., Ltd.

<u>Tate Nathan Walker</u>, Lead Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States.  Also on the brief were <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel was <u>Jack Dunkelman</u>, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>John Robert Magnus</u>, Tradewins LLC, of Washington, D.C., for consolidated defendant-intervenor SunPower Manufacturing Oregon, LLC.

      Kelly, Judge: Before the Court is the U.S. Department of Commerce's ("Commerce") second remand determination pursuant to the Court's remand order, <u>see</u> Second Remand Order (Jan. 30, 2025), ECF No. 170, on Commerce's final determination in its 2017–2018 administrative review of the antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("China").  <u>See</u> Final Results of Second Redetermination Pursuant to Court Remand (May 20, 2025), ECF No. 179-1 ("Second Remand Results"); <u>see generally</u> <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China</u>, 85 Fed. Reg. 62,275 (Dep't Commerce Oct. 2, 2020) (final results of antidumping duty admin. review and final determination of no shipments; 2017–2018) ("Final Results"), and accompanying Issues & Decision Memo. for the <u>Final Results of the 2017–2018 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China</u>, A-570-979 (Sept. 28, 2020), ECF No. 49-5 ("Final Decision Memo").  <u>See generally</u> Final

Results of Redetermination Pursuant to Court Remand, (July 5, 2022) ECF Nos. 137-1, 138-1 ("First Remand Results").

## BACKGROUND

The Court presumes familiarity with the facts of this case as set out in previous opinions, see Risen Energy Co. Ltd. v. United States, 569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022) ("Risen I"); Risen Energy Co. Ltd. v. United States, 611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022) ("Risen II"); Risen Energy Co. Ltd. v. United States, 122 F.4th 1348 (Fed. Cir. 2024) ("Risen III"), and recounts the facts necessary for this remand. In Risen I, the Court sustained Commerce's choice of the primary surrogate country and its overhead ratio calculation, but remanded Commerce's application of partial adverse facts available to certain respondents, valuation of backsheets, its selection of surrogate values for certain inputs,[1] and its separate rate calculation for further consideration.  See Risen I, 569 F. Supp. 3d at 1338.  On remand, Commerce revised the surrogate import data used to value silver paste, continued to value backsheets and ethyl vinyl acetate ("EVA") as in the Final Results, under respectful protest declined to apply an adverse inference when selecting from facts otherwise available for the dumping margin calculations, and revised the weighted average dumping margins as appropriate, including for certain separate rate respondents.  See First

---

[1] Commerce selected Malaysian company Hanwha Q Cells' ("Hanwha") 2018 audited financial statements and their notes as surrogate data for certain inputs in its calculations.  Risen Final Surrogate Value Submission – Part I, ("Risen's SV Submission"), PD 363–373, bar code 3926048–01 (Jan. 2, 2020), Exhibit SV2-8 ("Financial Statements").

Remand Results. The Court sustained the remand results in <u>Risen II</u>. <u>Risen II</u>, 122 F.4th at 1389–94. On March 3, 2023, Risen appealed this Court's affirmance of Commerce's surrogate value selections for backsheets and EVA, and its overhead ratio calculation from <u>Risen I</u>. <u>See</u> Second Remand Results at 2. On December 9, 2024, the Court of Appeals affirmed this Court on the backsheets and EVA surrogate value issues but vacated the decision sustaining Commerce's overhead ratio calculation and directed a remand on that issue. <u>See</u> <u>Risen III</u>, 122 F.4th at 1348.

The Court of Appeals required further explanation for two of Commerce's determinations with respect to the overhead ratio. <u>See</u> <u>id.</u> at 1357–58. First, it questioned Commerce's identification of energy costs. <u>See</u> <u>id.</u> at 1357–58. Commerce assumed that the cost of "inventories" represented the costs of materials, labor, and energy. <u>See</u> <u>id.</u> at 1357–58. The Court of Appeals reasoned that "inventories" could also include manufacturing overhead and therefore rejected Commerce's position as unsupported by the record. <u>See</u> <u>id.</u> at 1357–58. Second, the Court of Appeals rejected as speculative Commerce's determination that the difference between the total cost of sales and the inventories costs was manufacturing overhead. <u>Id.</u> at 1358.

On January 30, 2025, this Court remanded the matter to Commerce. <u>See</u> Second Remand Order, Jan. 30, 2025, ECF No. 170. On April 22, 2025, Commerce issued its Draft Remand Redetermination. Draft Results of Remand Redetermination, bar code 4750618-01 (Apr. 22, 2025) ("Draft Remand Results"). On May 6, 2025, JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology

Co., Ltd., JingAo Solar Co., Ltd., and Risen Energy Co., Ltd. submitted comments in opposition to Commerce's remand redetermination.  See JA Solar's Letter, "Comments on Draft Results of Remand Redetermination," PD 4, bar code 4769525-02, (May 6, 2025) ("JA Solar's Draft Remand Comments"); see also Risen's Letter, "Comments on Draft Remand," PD 5, bar code 4769525-03, (May 6, 2025), ("Risen's Draft Remand Comments").

On May 20, 2025, Commerce issued its second remand determination.  Second Remand Results.  On July 21, 2025, Plaintiffs submitted comments in opposition to Commerce's remand redetermination in the Second Remand Results.  See JingAo Solar Co., Ltd., Shanghai JA Solar Technology Co., Ltd., JA Solar Technology Yangzhou Co., Ltd.'s Comments on Remand Results, July 21, 2025, ECF No. 183 ("JA Solar's Comments"); Canadian Solar (USA) Inc., CSI Cells Co., Ltd., Canadian Solar Manufacturing (Luoyang), Inc., Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar International Limited, Canadian Solar Inc.'s Comments on Remand Results, July 21, 2025, ECF No. 185; Shanghai BYD Co., Ltd.'s Comments on Remand Results, July 21, 2025, ECF No. 186; Risen Energy Co., Ltd.'s Comments on Remand Results, July 21, 2025, ECF No. 187 (Risen Comments); Anji DaSol Solar Energy Science & Technology Co., Ltd.'s Comments on Remand Results, July 21, 2025, ECF No. 188.[2]  The United States filed its reply on September 30, 2025.  Defendant United

---

[2]  Plaintiff Risen Energy Co. Ltd., Consolidated Plaintiffs and Plaintiff-Intervenors are referred to collectively as "Risen" throughout unless specifically noted otherwise.

States' Reply ("Def. Reply"), Sept. 30, 2025, ECF No. 193.  Oral argument was held

on December 11, 2025.  Oral Argument, Dec. 11, 2025, ECF No. 206.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under Section 516A of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(a)(2)(B)(iii),[3] and 28 U.S.C. § 1581(c) to review actions

contesting the final results of an administrative review of an antidumping duty order.

The Court must set aside any determination, finding, or conclusion that is

unsupported by substantial evidence on the record or otherwise not in accordance

with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence requires more than a

"mere scintilla" of evidence, but "less than the weight of the evidence." Nucor Corp.

v. United States, 675 F. Supp. 2d 1340, 1345 (Ct. Int'l Trade 2010) (quoting Altx, Inc.

v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).  Commerce "must articulate

a rational connection between the facts found and the choice made," and that

determination is reviewed "on the basis of the reason articulated and evidence relied

on in its decision." Rhodia, Inc. v. United States, 185 F. Supp. 2d 1343, 1348 (Ct. Int'l

Trade 2001) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156

(1962); SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (internal quotation marks

omitted)).  The Court reviews a remand redetermination for compliance with its

---

[3]  Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

Consol. Court No. 20-03743                                                          Page 8

remand order. <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

## DISCUSSION

The Court of Appeals remanded Commerce's overhead ratio calculations after finding its determinations of energy and manufacturing overhead unsupported. <u>See</u> <u>Risen III</u>, 122 F.4th at 1358. On remand, Commerce maintains its overhead ratio calculation but provides further explanation in support of its determinations. Second Remand Results at 1–2. Commerce explains that in its experience, where financial statements lack specific line items for energy, energy costs are typically captured within manufacturing overhead. <u>Id.</u> at 3–4. Hanwha's financial statements do not contain a specific line item for energy, and the financial notes indicate that inventories costs include a "proportion of manufacturing overheads," and thus, Commerce reasons the inventories cost includes some energy costs. <u>Id.</u> at 17–18. Additionally, Commerce treats the difference between the cost of sales and inventories cost ("the residual"), which is otherwise unaccounted for in the financial statements, as manufacturing overhead. <u>Id.</u> at 5, 18. Risen argues that Commerce needlessly resorts to the financial notes, misinterprets those notes, and overstates overhead relative to prior segments and industry practice. <u>Id.</u> at 16–17; Risen Comments at 3, Attachment 1; 9–10. Finally, Plaintiff-Intervenors Shanghai BYD Co., Ltd., JA Solar Technology Yangzhou Co., Ltd, Canadian Solar, and Anji DaSol Solar Energy Science & Technology Co., Ltd. argue Commerce did not correct alleged

errors in the surrogate overhead financial ratio and that the resulting calculations are not supported by substantial evidence.  Pl. Int. Comments at 2.  For the reasons that follow, Commerce's Second Remand Determination is sustained.

## A.    Energy

Foreign merchandise sold in the United States at less than fair value is subject to antidumping duties.  19 U.S.C. § 1673.  To determine whether sales are at less than fair value, Commerce compares the "normal value" of the merchandise to the U.S. price.  Id.; 19 U.S.C. § 1677b(a).  Normal value is the price at which a producer or exporter sells the subject merchandise in the ordinary course of trade in its home market or, in certain circumstances, a third-country market.  19 U.S.C. § 1677b(a)(1).  In a nonmarket economy ("NME"), Commerce bases normal value on "the value of the factors of production utilized in producing the merchandise" together with amounts for general expenses, profit, containers, coverings, and other expenses.  19 U.S.C. § 1677b(c)(1).  "Commerce values certain factors of production, such as selling, general and administrative expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in [a] surrogate country."  Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1319–20 (Fed. Cir. 2010) (citing Dorbest Ltd. v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010)).  In constructing surrogate financial ratios, Commerce ordinarily relies on nonproprietary information from producers of identical or comparable merchandise in the surrogate country, including audited financial

statements and their notes.  See Dorbest, 604 F.3d at 1368 (citing 19 C.F.R.
§ 351.408(c)(4)).

     As a matter of practice, Commerce calculates the overhead surrogate financial
ratio by dividing manufacturing overhead by the sum of costs for materials, labor,
and energy.  See, e.g., Sulfanilic Acid from the People's Republic of China; Final
Results and Final Partial Rescission of Antidumping Duty Administrative Review,
67 Fed. Reg. 1,962 (Dep't Commerce Jan. 15, 2002) and accompanying Issues and
Decision Memo. at cmt. 4. ("Sulfanilic Acid").  Commerce identifies each component
of the formula from line items provided in the surrogate financial statements.  See
Final Decision Memo at cmts. 6, 12.  While Commerce cannot "go behind" the
financial statements, Commerce's practice is to use accompanying notes to aid in its
calculation of accurate financial ratios.  See, e.g., Certain Mobile Access Equipment
and Subassemblies Thereof From the People's Republic of China, 89 Fed. Reg. 88,730
(Dep't Commerce Nov. 8, 2024) and accompanying Issues and Decisions Memo at cmt.
2 ("Mobile Access Equipment") (using notes to the financial statements to determine
inputs in calculating financial ratios); Helical Spring Lock Washers From the People's
Republic of China, 80 Fed. Reg. 13,833 (Dep't Commerce Mar. 17, 2015), and
accompanying Issues & Decision Memo cmt. 6 ("Washers") (relying on financial notes
to determine overhead ratio inputs).  In Risen III, the Court of Appeals rejected
Commerce's conclusion, based on the financial statements and the International

Financial Reporting Standards ("IFRS"), that energy costs were captured in inventories cost based on the rationale Commerce provided.  122 F.4th at 1358.

On remand, Commerce continues to derive energy costs (along with material and labor costs) for its overhead ratio from the inventories cost identified within the financial statements but provides further explanation.  First, Commerce explains that as a matter of practice, where financial statements lack a specific line item for energy costs, it assumes that energy costs are included in any reported manufacturing overhead costs.  Second Remand Results at 3, 4, 7 (citing Sulfanilic Acid, 67 Fed. Reg. 1,963 at cmt. 4; Washers, 80 Fed. Reg. 13,833 at cmt. 4 (assuming utilities and other factory-level inputs are encompassed in the overhead value where the surrogate financial statements do not break out energy as a line item)); Boltless Steel Shelving Units From the Socialist Republic of Vietnam, 89 Fed. Reg. 28,743 (Apr. 19, 2024), and accompanying Issues & Decision Memo at cmt. 3 ("Boltless Steel") (finding that "the manufacturing overhead expense" includes production-related energy expenses where the financial statements do not independently identify energy costs); Magnesium Corp. of Am. v. United States, 938 F. Supp. 885, 896 (Ct. Int'l Trade 1996) ("Magnesium") (upholding Commerce's conclusion that factory-level utilities (including energy and power) are accounted for within manufacturing overhead costs in financial statements when supported by the record).  Second, because the Hanwha financial statements do not classify energy costs in a distinct line item, Commerce assumes that energy costs are included in manufacturing

overhead costs.  Second Remand Results at 3.  Third, Hanwha's inventories costs

contain direct materials and labor costs as well as a portion of manufacturing

overhead costs.  Id. at 4 (noting Note 2.12 provides that inventories costs include

"direct materials and labour and a proportion of manufacturing overheads based on

normal operating capacity").[4]  Therefore, Commerce concludes, based on its industry

experience, the absence of a specific line item for energy, its practice of concluding

that energy costs are located in manufacturing overhead where not separately listed,

and its reliance on Note 2.12, that some energy costs are included in the inventories

costs line item (along with the costs of materials and labor costs).  Id. at 18 (citing

Financial Statements at 29).

      Commerce bases its determination on substantial evidence.  Commerce relies

on record evidence, including Hanwha's financial statements and accompanying

notes, to deduce that some amount of energy costs is contained in inventories costs in

---

[4]  Note 2.12 provides:

    Inventories
    Inventories are stated at the lower of cost and net realisable value.
    Costs incurred in bringing the inventories to their present location and
    condition are accounted for as follows:
    Raw materials: purchase costs are derived by using the weighted
    average cost method.
    Finished goods and work-in-progress: costs of direct materials and
    labour and a proportion of manufacturing overheads based on normal
    operating capacity.  These costs are assigned by using the weighted
    average cost method.
    Net realisable value is the estimated selling price in the ordinary course
    of business less estimated costs of completion and the estimated costs
    necessary to make the sale.
Financial Statements at 29.

Consol. Court No. 20-03743                                    Page 13

addition to the costs of materials and labor.  Id. at 4; Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  In response to the Court of Appeals' concerns, Commerce clarifies that energy is only one component of overhead reflected in inventories costs.  Id. at 5, 18 (citing Risen III, 122 F.4th at 1358).  While Commerce concedes that some overhead, other than energy, may be included in the inventories costs, Commerce explains that, without "going behind" the financial statements, it cannot strip out non-energy overhead costs from the inventories cost reported in Note 17.[5]  Id. at 18.[6]  Thus, Commerce's determination to use the inventories costs (which includes material, labor and some energy costs) in the denominator of the overhead ratio is consistent with the Court's remand order, supported by substantial evidence, and in accordance with law.

_____

[5] In addition to Note 2.12 discussed above, Commerce also relies on Note 17 which provides "[T]he amount of inventories recognised as an expense in cost of sales of the Group and of the Company were RM 1,648 million" and lists inventories costs for raw materials, works-in-progress, finished goods and spare parts.  Financial Statements at 51.

[6] Risen argues that resorting to Notes 2.12 and 17 is unnecessary to calculate the overhead ratio.  Risen Comments at 4, 13.  Further, Risen argues that the precise amount of energy captured in the inventories costs as a proportion of manufacturing overhead cannot be identified, and therefore, should be ignored.  See Risen Comments at 4.  Commerce explains, however, that Risen's alternative is not only speculative, but less accurate than Commerce's method because Risen, without using the notes, does not identify energy costs anywhere in the financial statements.  See generally, Second Remand Results at 12–13.  Commerce further explains that using the RM 1,648 million inventories cost figure as the denominator, which includes not only energy but also some amount of manufacturing overhead, would not overstate the ratio.  Id. at 18.

**B.    Manufacturing Overhead Costs**

Risen III remanded Commerce's overhead ratio determination, finding that Commerce's allocation of the RM 257,063 in "unidentified costs" (i.e., the residual difference between cost of sales and the inventories costs) to the overhead ratio numerator was "based on nothing more than guesswork or speculation, not substantial evidence."    Risen III, 122 F.4th at 1358.    On remand, Commerce maintains its manufacturing overhead costs determination and provides additional explanation.  Second Remand Results at 1–2.  Risen argues that Commerce's reliance on Notes 2.12 and 17 to categorize costs is unnecessary, the resulting overhead ratio is overstated relative to prior reviews, and Commerce inadequately explains why it treats the residual, (i.e., difference between the costs of sales and the inventories cost) as manufacturing overhead.  Risen Comments at 7, 15, 16.

As discussed, to calculate overhead ratios, Commerce "normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country."  19 C.F.R. § 351.408(c)(4).  Where the best available financial statements lack the full level of detail that Commerce prefers, Commerce interprets the information, within its discretion, with the goal of calculating the most accurate margin.  See Yangzhou Bestpak Gifts & Crafts co., Ltd. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).  As a matter of practice, where a cost unaccounted for within the surrogate financial statements, Commerce relies

on information available from the record to deduce how the cost should be categorized. See Certain Frozen Warmwater Shrimp From the People's Republic of China, 77 Fed. Reg. 53,856 (Dep't Commerce Sept. 4, 2012) and accompanying Issues and Decisions Memo at cmt. 13 (where expenses are unaccounted for within the surrogate financial statements, Commerce "look[s] to the information provided" including the "activity and the principal operations of the company" to determine where to include the unallocated expense in the financial ratio); Glycine From the People's Republic of China, 70 Fed. Reg. 47,176 (Dep't Commerce Aug. 12, 2005) and accompanying Issues and Decisions Memo at cmt. 3 (surrogate financial statements reported a line item titled "other income;" Commerce deduced from its experience and the financial statements that "other income" included by-product sales).  Further, Commerce's practice is to use accompanying notes to aid in its calculation of accurate financial ratios where the financial statements alone do not provide adequate information.  See e.g., Mobile Access Equipment, 89 Fed. Reg. 88,730 at cmt. 2; Washers, 80 Fed. Reg. 13,833 at cmt. 3.

Here, Commerce begins with audited surrogate financial statements and derives an overhead ratio from the costs reflected in the cost of sales and inventories notes.  Second Remand Results at 3.  Commerce notes that only part of manufacturing overhead is accounted for in the inventories costs.  Id. at 18.  Commerce explains because "only a portion of all manufacturing overhead expenses are in the cost of Hanwha's inventory means that additional manufacturing overhead expenses are

included elsewhere on Hanwha's financial statement." Id. at 18.  However, Hanwha's

financial statements include line items for (1) selling and administrative expenses,

(2) other expenses, (3) finance costs, and (4) Income tax expense.  Id. at 19 (citing

Financial Statements at 20, 41, 42).  None of these line items would include overhead

expenses.  Id. at 19.  Thus, Commerce reasons some manufacturing overheerd is

unaccounted for in Hanwha's financial statements.

Commerce reasons the residual (difference between cost of sales and

inventories costs) necessarily includes otherwise unaccounted-for manufacturing

overhead costs.  Commerce reaches this conclusion because record evidence indicates

that Hanwha is primarily a manufacturer of products.  See id. at 9.  Specifically,

Commerce notes that Hanwha's 2018 financial statements do not reference selling

services and describe Hanwha's activities as the "design, development and

manufacture of silicon photovoltaic wafers, cells and modules (i.e., products)."  See id.

(citing Financial Statements at 16).  Accordingly, Commerce concludes "the

unidentified expenses in question are product costs, not period costs."  Id. at 8–9.

Further, the "cost of sales has been defined on this record as including direct

materials, direct labor, and factory (or manufacturing) overhead costs."  Id. at 19.

The residual is part of the total cost of sales, therefore the remaining difference

between the cost of sales and inventories costs must be the unaccounted-for

manufacturing overhead.[7] Id. at 18–19.

Risen argues that inventories costs must include all manufacturing overhead

under IAS 2.10, which provides

> The cost of inventories shall comprise all costs of purchase, costs of
> conversion and other costs incurred in bringing the inventories to their
> present location and condition.

Risen Comments at 4; International Financial Reporting Standards Foundation, IAS

2 Inventories, Standard, ("IAS2") https://www.ifrs.org/issued-standards/list-of-

standards/ias-2-inventories/#standard, IAS 2.10 (last accessed Dec. 22, 2025).[8]

However, IAS 2.13 explains:

> The allocation of fixed production overheads to the costs of conversion is
> based on the normal capacity of the production facilities. Normal
> capacity is the production expected to be achieved on average over a
> number of periods or seasons under normal circumstances, taking into
> account the loss of capacity resulting from planned maintenance. The
> actual level of production may be used if it approximates normal
> capacity. The amount of fixed overhead allocated to each unit of
> production is not increased as a consequence of low production or idle

---

[7] Accordingly, Commerce used the RM 257,063 residual (together with the depreciation costs) for a total of 357,156, divided by RM 1,646 million (cost of inventories) as its surrogate financial ratio for manufacturing overhead. Second Remand Results at 5.

[8] As discussed above, Risen also disputes Commerce's interpretation of Note 2.12 that leads to Commerce's conclusion that only a portion of manufacturing overhead is included in the inventories costs. Risen Comments at 4–5. However, Risen's alternate interpretation of Note 2.12 would require Commerce to disregard the phrase "based on normal operating capacity." Commerce's interprets Note 2.12 to exclude unit cost for actual production quantities from inventories where those costs exceed normal operating capacity. Second Remand Results at 20–21. As a result, the difference between normal operating capacity cost and actual unit costs would logically be included in the residual.

> plant. Unallocated overheads are recognized <u>as an expense</u> in the period
> in which they are incurred.

IAS 2.13. Accordingly, consistent with IFRS, the inventories costs will not necessarily reflect actual costs of manufacturing overhead. <u>See</u> IAS 2.10; 2.13. Indeed, Commerce explains "the unit cost of all manufacturing overhead that was included in the cost of inventory was not based on actual production quantities, but rather, was based on production quantities at normal operating capacity." Second Remand Results at 20.

Risen contends that this allocation produces an outlier ratio when compared with prior reviews, comparable cases, depreciation patterns, and Commerce's usual practice of placing residual amounts in materials, labor, and energy. Risen Comments at 3, Attachment 1; 9–10. Commerce addresses Risen's concern by explaining that the prior reviews were not only based on different records but also involved different surrogate countries and surrogate companies. Second Remand Results at 24; <u>see also</u> <u>Jiaxing Brother Fastener Co. v. U.S.</u>, 822 F.3d 1289, 1299 (Fed. Cir. 2016) (quoting <u>Qingdao Sea–Line Trading Co. v. U.S.</u>, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts on the record")).

Risen offers an alternative methodology for calculating the overhead ratio that considers only identified overhead items, such as specified depreciation amounts, and treats operating lease charges, including charges, for office or building use under a

government land lease, as overhead.  Id. at 15.  Critically, Risen's methodology does not allocate the residual portion of cost of sales.[9]  Id. at 14–15; Risen Comments at 17–18.  Commerce also rejected Risen's methodology explaining because it, inter alia, unnecessarily constructs the materials, labor and energy denominator when the financial notes provide an explicit amount, RM 1,646, that Commerce interprets to include materials, labor and a proportion of manufacturing overhead.   Second Remand Results at 14, 24. Commerce therefore concludes that its methodology is more accurate than Risen's proposal.   Commerce's determination is reasonable.

---

[9]  Although Risen's alternative methodology does not account for the residual in the overhead ratio, Risen hypothesizes why the residual may exist.  See Risen Comments at 13–15.  Risen suggests that the residual may be "related to purchases or resales of finished goods" that are included in cost of sales but not inventories costs.  Id. at 14.  Commerce responds that "there is no indication in Hanwha's financial statements that the company purchases and resells finished products," and that the statements instead describe Hanwha's activities as the design, development and manufacture of products.  Second Remand Results at 22.  Risen also suggests that the residual may be attributable to whether inventories or recorded based on costs or net realizable value.  Risen Comments at 14.  Commerce responds by citing Note 17, which states that the "cost of inventories" is "recognized as an expense in cost of sales."  Second Remand Results at 23.  Thus, Commerce concludes that "any expense related to a net realizable value adjustment would have been included in the RM 1,648" cost of inventories and therefore would not be reflected in the residual.  Id.  Risen also reiterates a contention that the Court of Appeals rejected, stating "[i]ndeed, given materials, labor, and energy . . . expenses are the overwhelming majority of the "Cost of Sales," Commerce normally allocates any remaining "Cost of Sales" costs to the MLE denominator."  Id. at 17; (citing Risen III, 122 F.4th at 1356, n.8 ("Risen's contention that the unidentified remaining costs should be considered additional {material, labor, and energy} is unsupported")).  Risen offers no record evidence to support these hypotheses and, in any event, does not explain why Commerce's weighing of the record evidence, including the financial statements, is impermissible.  See generally, Risen Comments.

In sum, Commerce relies on record evidence, the cost of sales, inventories costs, and the accompanying financial notes, as well as Hanwha's operations and expense line items to infer that (1) inventories costs include some energy costs, and (2) the difference between cost of sales and inventories costs reflects manufacturing overhead. See id. at 6–7, 10. Given the record evidence, Commerce's inferences are reasonable. In an attempt to detract from Commerce's determination, Risen points to record evidence, namely cost of sales and the specific overhead line items, to argue that (1) there are no other meaningful overhead expenses despite the difference between cost of sales and inventories costs, and (2) the difference between cost of sales and the identified overhead line items should be allocated to materials, labor and energy, notwithstanding that the financial notes provide an explicit amount for direct materials, labor and a portion of manufacturing overhead. See Risen Comments at 6–7, 17. Commerce addresses Risen's arguments and reasonably explains why it rejects Risen's approach. More importantly, Risen fails to undermine the reasonableness of Commerce's approach. Therefore, Commerce's determination is sustained.

## C.    Calculation of the Separate Rate

Plaintiff-Intervenors Shanghai BYD Co., Ltd., JA Solar Technology Yangzhou Co., Ltd, Canadian Solar, and Anji DaSol Solar Energy Science & Technology Co., Ltd. (collectively "Plaintiff-Intervenors") commented on the Second Remand Results and argue that the Court should remand for Commerce to recalculate a separate rate

Consol. Court No. 20-03743                                                    Page 21

for each Plaintiff-Intervenor.  Plaintiff-Intervenors' Comments on Final Results of

Remand Determination, July 21, 2025, ECF No. 188 ("Pl. Int. Comments") at 1–2.

Commerce applied the correct legal framework for separate rate respondents

and calculated the separate rate as the weighted average of Plaintiff-Intervenors'

margins, consistent with 19 U.S.C. § 1673d(c)(5)(A) and 19 C.F.R. § 351.107(d).

Because the Court sustains Commerce's surrogate overhead ratio, there is no error

in Commerce's separate rate analysis and no basis to reopen separate rate

calculations on this record.  See 19 U.S.C. § 1673d(c)(5)(A); Albemarle Corp., 821 F.3d

at 1352–54.  Therefore, Commerce's separate rate determination on remand complies

with the Court's order, is supported by substantial evidence, and is in accordance

with law.

## CONCLUSION

For the foregoing reasons, Commerce's determinations in the Second Remand

Results are supported by substantial evidence, are in accordance with law, and

comply with the Court of Appeals' order in Risen III.  They are therefore sustained.

Judgment will enter accordingly.


                                                    /s/ Claire R. Kelly
                                                    Claire R. Kelly, Judge


Dated:       January 8, 2026
             New York, New York